OPINION OF THE COURT
Sandra B. Edlitz, J.
*604 The parties were married on December 9, 1989 and lived together in Yonkers, Westchester County, New York, until the Respondent went to Ontario, Canada, with the children in or around August 1995. The Petitioner wrote a letter dated August 21, 1995, presumably for the customs and immigration officials, stating that he gave his permission for Respondent and the children to enter Canada until December 21, 1995. However, Respondent remained in Canada past that date.
In late 1995, Respondent filed for custody of the children in Canada. The trial court there assumed jurisdiction and awarded "interim interim custody” to her. An intermediate appeals court upheld the order but found that the children were not habitually resident in Ontario. Petitioner appealed.
By order dated August 13, 1996 (Kruzick, J.), the Ontario Court of Justice (General Division) reversed to the extent that Respondent was directed to return the children to New York. The court applied the Hague Convention on Civil Aspects of International Child Abduction, which controls international custody disputes, and to which both Canada and the United States are signatories. The Ontario court found, inter alia, that the children were habitually resident in the State of New York prior to their removal and that while Petitioner consented to the children going to Canada until December 21, 1995, their retention in Canada by Respondent after that date was wrongful. Judge Kruzick, in ordering Respondent and the children to return to New York, maintained Respondent’s "interim interim custody”, and directed Petitioner to provide Respondent with airline tickets, a two-bedroom apartment and $2,000 per month, plus medical services. This order was to remain in effect unless or until a New York court ordered otherwise. Pursuant to the Canadian order, mother and children returned to New York on September 23, 1996 and have been residing in an apartment in Yonkers during the pendency of this proceeding.
On September 18, 1996, M. S. (hereinafter referred to as the Petitioner or the father) filed a verified petition in this court seeking custody of his two children, Mark, born November 14, 1990, and Michelle, born August 1, 1992. On September 23, 1996, he also filed a verified petition seeking visitation with the subject children. C. S. (hereinafter referred to as the Respondent or the mother) filed a verified petition in this court on September 26, 1996 also seeking custody of the aforementioned children. The mother seeks to reside in Canada with the children. The father opposes this move as not being in the children’s best interests. He claims that such a move would *605 deprive him of regular and frequent access to his children. He also expresses concern that the living environment in Canada is inappropriate for the children.
A fact-finding hearing was held. Each party was represented by counsel. The children were represented by a court-appointed Law Guardian. The parties and Law Guardian waived clinical evaluations.
On January 6, 1997, this court directed Respondent not to remove the children from the court’s jurisdiction. It also reiterated that consistent with the Canadian order, it had assumed exclusive jurisdiction of this matter.
At trial, both parties testified. In addition, they each proffered the testimony of several witnesses. Several photographs, letters and other documents were also admitted into evidence.
Petitioner presented to this court as an honest and responsible person, genuinely interested in his children’s welfare. He testified to being a very involved parent from the day each child was born. He diapered them as babies and has always liked to play with his children, and participate with them in family gatherings and festivities. Petitioner’s brother and sister and their respective spouses testified to the close relationship the subject children have with their father as well as with their paternal grandfather, aunts and uncles and cousins, all of whom reside in Westchester County. In fact, Petitioner lives in the same house as his father. The children resided there from birth until their mother took them with her to Canada. Since the children returned from Canada last September, they have spent a considerable amount of time there with their father and grandfather.
Petitioner, contrary to Respondent’s assertions, stated that while he knew Respondent was going to Canada with the children in August 1995, he never knew of her wishes to remain there, and did not consent to her remaining there on a permanent basis. It is not disputed that during the one-year period that Respondent and the children were in Canada, Petitioner regularly and voluntarily sent them money, and made efforts to see them. According to his testimony however, he did not see his children until they returned to New York last September.
Respondent testified that she originally came to the United States around 1985-1986 to earn more money, married Petitioner in 1989, and remained here, except for a few visits to Canada. She also stated that when she left for Canada in *606 1995, she told Petitioner that it was permanent. At trial, she never articulated her reasons for leaving New York except to say at one point that her father’s illness was a factor. She went into great detail about her parents’ farm and equestrian center where she and the children lived from August 1995 until September 1996 when she was ordered to return to New York, and where they would continue to live if she were awarded custody. The farm and equestrian center house many animals, including over 30 horses, and several dogs, cats and birds. The house has been renovated to add more living space for the children. She admitted that many people and cars frequent the area for riding lessons and other purposes, and that the children have free access. She stressed, however, that the children have never been endangered by the animals or by the regular presence of many people on the farm. Respondent noted that she works at the farm giving riding lessons in addition to working about 44 hours per week as the manager of a pizzeria. When she is working, her mother is the children’s primary caretaker. Both children have learned to ride horses while in Canada. According to Respondent, Michelle is more enthusiastic about riding than Mark, who is more interested in playing hockey. Generally speaking, both children enjoy the farm and the various animals that live on it.
Respondent spoke fondly of Petitioner’s mother who passed away a few years ago. She conceded that her own mother is not a "huggy-kissy” person. This lack of affection by Respondent’s mother is borne out by the fact that Michelle told the Law Guardian that her maternal grandmother kisses her only in her dreams.
The court in the case at bar is presented with a family consisting of a husband, wife and two children. They lived together in Yonkers as an intact family from 1989 until August 1995 when the Respondent chose to move with the children to Canada, her native country. There is no divorce, and no previous order of custody except the interim order issued by the Canadian court, which sent the Respondent, the children and the case back to New York.
It is well settled that the sole criterion when questions of custody are confronted is the best interests of the child (Matter of Lincoln v Lincoln, 24 NY2d 270). This standard necessarily encompasses a myriad of factors such as psychological, economic, social and familial (Hatz v Hatz, 97 AD2d 629). Moreover, there is no prima facie right to custody of children in either parent; a presumption of "maternal superiority” is outdated. (Matter of Fountain v Fountain, 83 AD2d 694).
*607 Recently, in the companion cases of Matter of Tropea v Tropea and Matter of Browner v Kenward (87 NY2d 727) the Court of Appeals enunciated a new standard to be applied in cases involving custodial relocation, that standard being whether or not the proposed relocation by the custodial parent would serve the child’s best interests. While Tropea and its progeny generally refer to cases in which there were separation agreements, prior resolutions of custody/visitation issues by order or agreement, and the imprimatur of the courts, namely a judgment of divorce, a Tropea analysis is mandated here since this proceeding smacks of relocation.
The Court of Appeals in Tropea (supra) makes it clear that no one factor is dispositive in cases dealing with custodial relocation. The Court mentions a number of factors that should be considered: each parent’s reasons for seeking or opposing the move; the good faith of the parent in requesting or opposing the move; the quality of the relationships between the child(ren) and both parents; the impact of the move on the quality and quantity of contact with the noncustodial parent; and the feasibility of preserving the relationship through an appropriate visitation schedule (see, Blackburn v Santiago, NYLJ, Apr. 1, 1997, at 33, col 2). Our analysis must also include the factors that courts have traditionally referred to in making custody determinations.
The Court of Appeals perhaps put it best when it stated that each case: "must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on * * * the best interests of the child.” (Matter of Tropea v Tropea, supra, 87 NY2d, at 739.)
Accordingly, this court now proceeds to an analysis of the children’s best interests, based upon the evidence adduced at trial and evaluating the factors commonly considered in an initial custody determination, with an overlapping of Tropea elements.
This court does not find either parent unfit for the task of raising the children. The parties now live different lives. Respondent wants to live with the children in a rural area of Canada on her parents’ farm and equestrian center, some 550 miles from Yonkers and a 10-hour automobile drive. Her parents and brother live in the same residence as would Respondent and the children. Petitioner, who received a college degree in mechanical engineering, lives in Yonkers, owns a snack food route, and has several members of his family includ *608 ing his father, a brother and sister and nieces and nephews living in Westchester County. He also works part time at a convenience store. He testified that if he received custody of the children he would leave his position at the store and seek to purchase a home closer to his brother and sister and their children who reside in northern Westchester County.
The children have a close relationship with both parents, and that relationship should be preserved and fostered. If the Respondent is intent upon living in Canada, that action in and of itself disrupts the parent-child relationship. Indeed, the best way to ensure that the children’s interests are served would be for the parents to arrive at a mutually satisfactory agreement for the benefit of their children. However, they have not done so, and now the court is left with fashioning the most appropriate custodial arrangement, under the difficult circumstances presented. Judge Titone so aptly opined in Tropea that "[l]ike Humpty Dumpty, a family, once broken by divorce, cannot be put back together in precisely the same way.” (Matter of Tropea v Tropea, supra, 87 NY2d, at 740.) Although the case at bar does not yet involve a divorce, the fragmentation of the family is no less real, and the solutions no less elusive.
The parents are virtually on an equal footing when it comes to their parenting abilities, love and concern for, and involvement with their children. The court is confident that either parent would more than adequately provide for the children’s physical, emotional, educational and other needs, albeit in different venues and in different ways. It recognizes the disparity between a farm lifestyle and a suburban New York lifestyle, but will not go so far as to say that one environment is superior to the other.
The children love both of their parents, including their father. They have as much of a right to be with him as they do to be with their mother. They also have a loving and supportive extended family in their paternal grandfather, aunts, uncles and cousins. While the mother has family in Canada, there was no showing that the children have any real connection with their maternal grandparents or aunt or uncle. Interestingly enough, no one from the mother’s family testified, even though Respondent’s mother was in New York during a portion of this proceeding. She returned to Canada before the conclusion of the hearing. In fact, the Law Guardian, in recommending that the Petitioner father be awarded custody, noted that once the horses and other animals are removed from the equation, there is no reason for the children to be in Canada. *609 The evidence adduced at trial shows that while in Canada the children spent most of their time on the farm with people other than the Respondent. When Respondent is present on the farm she is working with the horses. She also holds a full-time job off the farm. During these times, her mother is the primary caretaker.
Petitioner, on the other hand, is generally more available to the children. He stated that the children are cooked nice meals whenever they are with him for visitation, and he will continue that practice. He also spends time with them on the weekends going on day trips, visiting his sister and her children, or just playing in the neighborhood. Moreover, Petitioner stated that he can always adjust his work hours, if such action is necessary.
Petitioner showed good faith in stressing that Respondent and the children should spend as much time together as possible because it is important for the children to maintain a relationship with their mother. Respondent on the other hand did not convince the court that she is committed to encouraging a relationship between the children and their father. She testified that if she received custody, Petitioner could see the children as often as he wished. However, such a simplistic proposal does not comport with the history of this case. For example, while the Respondent and the children were in Canada, Petitioner made at least two attempts to see the children to no avail. Petitioner also claimed that when he telephoned the children, Respondent’s mother would not allow the children to speak with him. In addition, Respondent admits that the distance from Ontario to Yonkers is substantial and that round-trip airfare from Toronto is approximately $450. If, as she suggested, the children could visit their father seven times per year in New York, she admits that such an arrangement would cost $3,000 per year for each child. While she stated that she would pay one half of the airfare, the court is not convinced that she would be able to do so.
The manner in which Respondent left this country also casts a pall over any claim that her actions in moving to Canada were done in good faith. She unilaterally and abruptly uprooted the children from the only home they ever knew and removed them to Canada. The only reason the court can glean for this behavior is that Respondent was dissatisfied with her marriage, and engaged in self-help to extricate herself from it. In doing so, she failed to take into account the children whom that union had created, or how her actions would deprive the *610 children of regular and meaningful access to their father. Moreover, her actions effectively deprived the courts of the State of New York of our jurisdictionally mandated parens patriae standing. Only after prolonged litigation in Canada was this court able to exercise its rightful jurisdiction.
The court has carefully assessed the credibility of all the witnesses, and has painstakingly reviewed all of the evidence. It has considered all of the relevant facts and circumstances and has weighed the potential loss of the children’s and father’s regular and meaningful access to each other, against whatever benefit a move to Canada may bring to the children. Quite simply, the court finds that the move to Canada would significantly impair the quantity and quality of the relationship between the children and their father. This loss of contact could not be cured or significantly reduced by any visitation schedule. Respondent set forth no basis for her sudden uprooting of the children from their home. With the exception of the children’s obvious enjoyment of the farm animals, she did not even remotely show how the children’s best interests would be served or how their lives would be enhanced by residing in Canada, far away from their father.
Accordingly, this court finds upon a preponderance of the evidence that it would be in the children’s best interests for custody to be awarded to the Petitioner father. Petitioner’s custody petition is granted. His visitation petition, as well as Respondent’s custody petition, are dismissed.
[Portions of opinion omitted for purposes of publication.]